MINNIE D. TICKNOR, as Administratrix, etc., of ELMER L. TICKNOR, Deceased, Plaintiff, *v.* PENNSYLVANIA RAILROAD COMPANY, Defendant.

Fourth Department, March 12, 1924.

Railroads — action to recover for death of plaintiff's intestate who was killed at railroad crossing — intestate was in sleigh — view of track was obstructed about ninety feet from track, was open from that point for forty-two feet towards track and then obstructed to point about thirteen feet from track — contributory negligence — burden was on defendant to establish where train first became visible — question of contributory negligence was for jury.

In an action to recover damages for the death of plaintiff's intestate who was killed at a railroad crossing while attempting to cross the same in a sleigh, the burden was upon the defendant to establish where the train became visible to a traveler on the highway, since it appears that the view of a traveler was obstructed to a point within about ninety feet of the track and that from that point for a distance of forty-two feet the view was unobstructed, when it was again obstructed by a shanty until the traveler reached a point about thirteen feet from the track.

Under the evidence, the question of contributory negligence on the part of the plaintiff should have been submitted to the jury, and it was error for the court to direct a verdict in defendant's favor.

MOTION by the plaintiff, Minnie D. Ticknor, as administratrix, etc., for a new trial upon a case containing exceptions, ordered to be heard at the Appellate Division in the first instance after the direction of a verdict in defendant's favor at the close of the case upon a trial before the court and a jury at the Chautauqua Trial Term in May, 1923.

*Nelson J. Palmer*, for the plaintiff.

*Harold J. Adams*, for the defendant.

SEARS, J.:

The sole question upon this motion for a new trial relates to the alleged contributory negligence of the plaintiff's intestate who was killed on December 28, 1921, by a train of the defendant while driving over a crossing shortly before noon on a clear, cold winter day.   He was entirely familiar with the crossing, having passed over it twice almost every day for a number of months.   At the time of the accident he was driving a team of horses harnessed to a bob-sleigh which he used to haul milk.   There was a top over the driver's seat and he was closed in with curtains, in which there were " celluloid lights " to his right and left, and in front and to his rear, so that he is said to have had a clear view in all directions.   The highway is an improved road and the plaintiff's intestate was proceeding toward the east.

The railroad runs northerly and southerly but the intersection is not quite at a right angle.   The train which struck plaintiff's intestate was coming from the north.   The defendant had two tracks at this point, but the main track upon which the train was running was the first one to be reached by one traveling easterly on the highway.

The horses were not young, and there was evidence that they were walking.   One witness says that the walking gait of these horses was between two and a half and three miles an hour.   The distance from the horses' noses to the driver was sixteen feet ten inches. The train was approaching at a rate of about fifty miles an hour, and there was evidence that no signals were given until immediately before the accident when the horses were already upon the track.

The view of the railroad toward the south, to one approaching as was the plaintiff's intestate, was substantially unobstructed for several hundred feet along the highway.   To the north, however, there was a cider mill distant sixty-four feet northerly from the center of the highway and seventy-five feet westerly from the track.   This completely obstructed the driver's view of the railroad to the north until the driver reached a point on the highway not definitely established in the evidence but at least ninety or one hundred feet from the track (judging from the exhibits).   From that point to a point forty-two feet from the track, the view to the north was clear.   From a point forty-two feet from the track to a point about thirteen feet from the track the view to the north was obstructed by a flagman's shanty.   After the driver's view became obstructed by this shanty at a point forty-two feet from the track, the driver had no further opportunity to make observation toward the north because the heads of his horses would have been already over the track when he came out from behind

the shanty and reached a point where he would have been able to see again to the north. The distance that a train could have been seen toward the north from the unobstructed part of the road is given by witnesses variously as " at least a thousand feet " and as " fifteen hundred feet or a quarter of a mile " along the track from the crossing. The burden was, of course, upon the defendant to establish where the train first became visible to the traveler on the road. (Decedent Estate Law, § 131, as added by Laws of 1920, chap. 919; Civ. Prac. Act, § 265.) If the horses were walking at the gait testified to, that is at the rate of from two and one-half to three miles an hour, the train running at fifty miles an hour was approaching at a speed from twenty to sixteen and two-thirds times as fast as the horses were walking. The engine struck the box of the sleigh, not the horses, so the driver was actually upon the track when the collision occurred. The jury might have found that the train was not visible to the plaintiff's intestate when he first came out from behind the cider mill or as he proceeded for some little distance from that point. His view again became obstructed when he reached a point about forty-two feet from the track because of the presence of the flagman's shanty. Even when he reached this point where the track again ceased to be visible, the jury might have found that the train was still a distance of seven hundred to eight hundred and forty feet distant from the crossing. After this it was not possible for him to see the train again until his horses were partly on the track.

The question of contributory negligence in cases of this character is ordinarily one of fact for the jury. (*Massoth* v. *Delaware & Hudson Canal Co.*, 64 N. Y. 524, 529.) Whether if the plaintiff's intestate looked as soon as he passed the cider mill and saw no train, he should have looked again under the circumstances is a question of fact for the jury. (*Carr* v. *Pennsylvania R. R. Co.*, 225 N. Y. 44.) The law does not require a traveler on the highway approaching a railway to look at the most favorable point for observation or at any particular place. He is only obliged to use ordinary care and caution which includes the necessity of looking both ways. (*Horton* v. *N. Y. C. R. R. Co.*, 237 N. Y. 38.)

Cases are cited by the defendant where the view remained clear as the traveler on the highway came close to the track where the traveler has been held negligent as a matter of law. (*Barnasky* v. *N. Y., O. & W. R. Co.*, 226 N. Y. 435; *Barry* v. *Rutland R. R. Co.*, 203 App. Div. 287; affd., 236 N. Y. 549; *McCullough* v. *Pennsylvania R. R. Co.*, 224 id. 541, affg. 177 App. Div. 952.) The obstruction of the shanty in this case distinguishes it from these authorities.

We are of the opinion that the shortness of the distance from the road from which the distant train was proved to have been within the sight of the plaintiff's intestate and the presence near the track of the obstruction of the shanty taken in connection with the other circumstances require the submission of the driver's negligence to the jury.

Plaintiff's exceptions should, therefore, be sustained and the motion for a new trial granted, with costs to the plaintiff to abide the event.

All concur; CROUCH J., not sitting.

Plaintiff's exceptions sustained and motion for new trial granted, with costs to plaintiff to abide event.